UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

BILLY LIGHTFOOT,

                    Petitioner,                    05 Civ. 0444

      -against-                                    OPINION

JOSEPH T. SMITH, Superintendent,
Shawangunk Correctional Facility,

                    Respondent.

-------------------------------------X

A P P E A R A N C E S :

Pro se

Billy Lightfoot
01-A-2339
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2|25|08

Attorneys for Respondent

ROBERT M. MORGENTHAU
District Attorney
New York County
One Hogan Place
New York, NY  10013
By:  Dana Poole, Esq.

**Sweet, D.J.**

Petitioner Billy Lightfoot ("Lightfoot" or the "Petitioner") has filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on the ground that his incarceration in accordance with an April 6, 2001 judgment of the New York State Supreme Court, New York County (Sudolnik, J.), is unconstitutional. By that judgment, Petitioner was convicted, upon his plea of guilty, of one count of Murder in the First Degree in violation of New York Penal Law § 125.27[1][a][vii][b]. Petitioner was sentenced to an indeterminate prison term of from 25 years to life, and he is currently in state custody pursuant to that judgment. For the reasons set forth below, the petition is denied.

## The State Court Proceedings

By New York County Indictment Number 1407/00, filed on February 25, 2000, Petitioner was charged with one count of Murder in the First Degree in violation of New York Penal Law § 125.27[1][a][vii][b], two counts of Murder in the Second Degree in violation of New York Penal Law §§ 125.25[1], [3], two counts of Attempted Murder in the

1

Second Degree in violation of New York Penal Law §§ 110.00/125.25[1], two counts of Assault in the First Degree in violation of New York Penal Law § 120.10[1], two counts of Robbery in the First Degree in violation of New York Penal Law §§ 160.15[1], [2], one count of Criminal Possession of a Weapon in the Second Degree in violation of New York Penal Law § 265.03[2], and one count of Criminal Possession of a Weapon in the Third Degree in violation of New York Penal Law § 265.02[4].

On February 21, 2001, Petitioner pleaded guilty to first-degree murder, in full satisfaction of the indictment and in exchange for a promised sentence of 25 years to life imprisonment (Appendix, Exhibit L: Plea Proceedings). Prior to sentencing, Petitioner moved pro se to withdraw his guilty plea. The court found no basis for granting Petitioner's motion, but appointed new counsel to review the merits before making a final ruling (Appendix, Exhibit M: Motion Proceedings). New counsel later informed the court that he could not support Petitioner's motion. The judge thereafter denied Petitioner's motion to withdraw his guilty plea, and sentenced him to the negotiated sentence of 25 years to life (Appendix, Exhibit N: Sentencing Proceedings).

2

On direct appeal, Petitioner argued that he had been denied effective assistance of counsel by the attorney who reviewed and ultimately refused to adopt Petitioner's plea withdrawal motion (Appendix, Exhibit O:  Appellant's Brief at 11-16).  The Appellate Division, First Department unanimously affirmed Petitioner's conviction.  People v. Lightfoot, 306 A.D.2d 107 (N.Y. App. Div. 2003), lv. denied, 100 N.Y.2d 643 (2003).

Petitioner filed a pro se petition for a writ of habeas corpus on January 14, 2005 with this Court.  Those proceedings were stayed for Petitioner to exhaust certain state court claims.  Petitioner subsequently moved, pro se, to vacate the judgment against him pursuant to New York Criminal Procedure Law § 440.10, arguing that his guilty plea was deficient and that he had been denied effective assistance by both attorneys assigned to represent him (Appendix, Exhibit U).  That motion was denied by the trial judge (Appendix, Exhibit W), and the Appellate Division denied Petitioner's application for leave to appeal that decision.  People v. Lightfoot, No. M-3187, 2005 N.Y. App. Div. LEXIS 10529 (N.Y. App. Div. Sep. 29, 2005).

Petitioner next filed a pro se petition for a
writ of error coram nobis, arguing that he had been denied
the effective assistance of appellate counsel (Appendix,
Exhibit AA). That petition was denied by the Appellate
Division, First Department. People v. Lightfoot, No. M-
6201, 2006 N.Y. App. Div. LEXIS 3671 (N.Y. App. Div. Mar.
23, 2006), lv. denied, 7 N.Y.3d 758 (2006).

Petitioner then filed an amended petition for a
writ of habeas corpus, dated July 25, 2006, incorporating
the ineffective assistance complaints that he raised in his
direct appeal, CPL § 440.10 motion, and petition for a writ
of error coram nobis.

The People filed its answer on May 23, 2007. The
issue was marked fully submitted on that date.

**Facts**

Petitioner's conviction arose from his guilty
plea, in which he admitted that, on the morning of December
20, 1999, he went to a Manhattan apartment and was in
possession of a gun. There, in the course of trying to
forcibly steal drugs from Fabio Corniel ("Corniel"),

4

Petitioner shot Corniel with the intention of causing his death.

At the time of Petitioner's guilty plea, the People had been prepared to proceed to trial with evidence showing that:

a. on the morning of December 20, 1999, Petitioner, armed with a fully loaded .45 caliber gun, left the state of Virginia with his accomplice, Jack White ("White"), and took a bus into Manhattan;

b. there, the two planned to steal drugs from Corniel, from whom Petitioner had previously purchased drugs over a two-year period;

c. once inside Corniel's apartment at 772 St. Nicholas Avenue, Petitioner was in the bathroom as the drugs were delivered;

d. as White removed the drugs from the apartment, Petitioner emerged and systematically shot:

(i) Cirspulo Esteves ("Esteves") at least three times, including in the neck and face, with two of those bullets leaving both entry and exit wounds;

(ii) Corniel twice in the head, killing him; and

(iii) Jesus Peralta ("Peralta") twice in the chest, resulting in wounds which required extensive hospitalization;

e. Petitioner stopped firing only when his gun was empty;

f. immediately after the shooting, Petitioner fled to Virginia and celebrated with the proceeds of the robbery by going "club-hopping" and buying a Jaguar the very next day;

g. when the police responded to the scene of the shooting, they found no guns inside the apartment;

6

h.    tests on the recovered ballistics evidence from the apartment disclosed that the only gun used during the crime was the gun possessed by Petitioner;

i.    subsequently,    four    separate    people identified Petitioner from a photographic array as someone they had seen at or near Corniel's building close to the time of the shooting;

j.    on August 2, 2000, Esteves and Peralta separately identified Petitioner in a line-up as the man who had shot them; and

k.    Petitioner admitted to police, in both written and videotaped statements, that he shot the three men.  Specifically, Petitioner told law enforcement that:

> (i)  he had bought drugs from Corniel over a two-year period;

> (ii) on December 20, 1999, he had armed himself with a fully loaded .45 caliber gun and went with White to Corniel's apartment carrying $10,000 to buy drugs;

(iii)    when he arrived, there were no drugs in the apartment, but sometime later two other men arrived while Petitioner was in the bathroom;

(iv) when Petitioner emerged, one of the men put his hand in the waistband of his pants; viewing that action as a threat, Petitioner shot him;

(v) Petitioner then shot Corniel, whom White had in a choke-hold;

(vi) White pointed to the third man in the kitchen, and Petitioner shot him as well; and

(vii)    Petitioner then fled with the $10,000, catching up with White, who he later learned had left the apartment with the drugs.

A warrant was issued for Petitioner's arrest and, on May 25, 2000, Petitioner waived extradition and was brought from Virginia to New York. Defense counsel Oliver Smith, Esq. ("Smith"), certified as lead counsel on capital

cases by the Office of the Capital Defender, was appointed to represent Petitioner.

On October 27, 2000, the People filed a statement indicating that they would not seek the death penalty against Petitioner, but would seek a sentence of life imprisonment without parole (Appendix, Exhibit B).

Petitioner thereafter moved to suppress his written and videotaped post-arrest statements, physical evidence from his residence, and the photographic and line-up identifications (Appendix, Exhibit E; Appendix, Exhibit D: 6/30/00 VDF). On January 23, 2001, the Honorable Bernard J. Fried ordered a hearing on the motions to suppress Petitioner's statement to police and identification testimony. Justice Fried also ordered the search warrant affidavit be provided for his review (Appendix, Exhibit G). On February 14, 2001, following his examination of documents related to the searches at issue in the suppression motion, Justice Fried denied Petitioner's motion to suppress the items seized pursuant to them (Appendix, Exhibit H).

On February 20 and 21, 2001, the Honorable Joan Sudolnik presided over the Huntley/Wage hearing ordered in response to Petitioner's suppression motion. Four of the People's five scheduled witnesses testified, including Detectives Elpidio Deleon ("Deleon"), Antonio Rivera ("Rivera"), Carlton Berkley ("Berkley"), and Sergeant Craig Gardella ("Gardella").

Detective Deleon testified that Petitioner had been identified in photo arrays by:

a.   Josephina Reyes ("Reyes"), the common-law wife of Corniel, the deceased victim;

b.   Estevez, one of the surviving victims;

c.   Sandro Laro ("Laro"), who had seen Petitioner on the street prior to the shooting; and

d.   Chris Joseph ("Joseph"), who had seen Petitioner running into the subway on the day of the homicide (Deleon: 6-18, 65, 74-75, 78-85; People's Hearing Exhibit 1: Photo Array; Exhibit 2; Polaroid Photo Array).

Petitioner was also identified in lineup, at
which his attorney was present, by Reyes, Esteves, and
Paralta, the other surviving victim (Deleon: 60-62, 124-
130; Rivera: 149-156, 159-173; People's Hearing Exhibit 7:
Photographs of Lineup).

Detective Deleon also testified that he met with
Petitioner on February 9, 2000 in a Culpeper, Virgina
police station. Deleon informed Petitioner that he was
investigating a December 1999 homicide in New York, in
which three people had been shot and one of them killed.
The detective told Petitioner that the two survivors had
identified him as the shooter, other witnesses had
identified him running from the scene, and White had
already provided the police with information about what had
happened.[1] The detective said that Petitioner would be

---

[1] A voluntary disclosure form provided by the People prior
to White's guilty plea in the joint case against Petitioner
and White showed that on February 8, 2000, White told
police that he had gone with Petitioner to New York City to
buy drugs from "Fabio." Petitioner was in the bathroom
when several men arrived with the drugs, and Petitioner
emerged and "started shooting at one of the guys." After
"every one started running," Petitioner shot Fabio and then
"the other male" who was running toward another room"
(Appendix, Exhibit C: 3/3/00 VDF: Statement #1). White
later added, "I knew Billy was going to rip Fabio off, we
didn't have all the money for the powder and he was
carrying the gun all the time" (id.: Statement #2). On
March 1, 2000, White again told the police that he and

11

"going back to New York" regardless of whether he confessed, but that the police wanted to hear his side (Deleon: 18-25, 85-111).[2] Deleon then read Petitioner his Miranda warnings before questioning him (Deleon: 18-25, 39-53, 85-111, 134-137; Appendix, Exhibit I: People's Hearing Exhibit 3A: Miranda warnings sheet).

On February 21, 2001, after four of the People's five witnesses had testified at the suppression hearing and the court took a brief recess, defense counsel advised the court that Petitioner had authorized him to enter a plea of guilty to Murder in the First Degree, in full satisfaction of the indictment (Appendix, Exhibit L: Plea Proceedings at 193).

---

Petitioner were "supposed to rip the drugs" and that White knew Petitioner had a gun, but "didn't think he was going to use it" (id.: Statement #3).

[2] When Petitioner began to ask the detective a question, Detective Deleon used it as an opportunity to determine whether Petitioner could read and write by asking Petitioner to write down the questions. One of the questions Petitioner posed was, "Is it possible that I could get less than 15," to which the detective replied, "No," and explained that it was his experience that "most of the time with plea bargains, most of the defendants do get about 15 years, based on homicides alone, just for murders on pleas" and that "just for shooting a guy, Assault 1 cases," defendants generally bargained for "anywhere from 5 to 10 on a plea" (Deleon: 46-50).

Before agreeing to accept the plea, the court asked counsel whether Petitioner understood that by pleading guilty, he would be admitting that he intended to cause the death of Fabio Corniel by shooting him with a pistol, and that he killed Corniel in the course of attempting or committing a robbery and in furtherance of that robbery. Both counsel and Petitioner affirmed that Petitioner understood that consequence (id. at 194).

After further interrogation, the judge then asked:

> Okay, you understand, also, that by pleading guilty, you are giving up any defenses you may have in this case?
>
> I don't know what those are, but I'm sure you've discussed that with your attorney. You understand that by pleading guilty, you are giving up the right to claim any kind of defense?

(id. at 201). Petitioner replied, "Yes, ma'am."

The court then accepted Petitioner's guilty plea to the crime of Murder in the First Degree (id. at 201-202).

13

On March 22, 2001, Petitioner and his counsel appeared before Justice Sudolnik for sentencing. At the commencement of the proceeding, defense counsel advised the court that the previous day Petitioner had indicated that he wanted to withdraw his plea, and Petitioner had confirmed that he still wanted to do so that morning (Appendix, Exhibit M: Motion Proceedings at 2).

Defense counsel suggested that the court assign a new attorney to review the plea minutes to determine whether there was any basis for Petitioner's withdrawal motion (id. at 3).

Noting that she remembered Petitioner's plea "very well," the judge recalled that Petitioner had chosen to plead guilty after he heard the hearing testimony and the People were prepared to proceed to trial. The court further recalled that Petitioner had not been rushed in taking his plea, and "knew exactly what his situation was" when he "chose to plead guilty." The judge also opined that Petitioner had received a "favorable plea bargain" in that he would have received a "far greater" sentence if convicted after trial. Based on the attendant

14

circumstances of Petitioner's plea, the judge found no basis for granting his withdrawal motion (id. at 3-4).

The judge agreed to order the minutes and adjourned the case until March 27, 2001 (id. at 8-9), upon which date the court ordered Patrick Brackley, Esq. ("Brackley"), to represent Petitioner in place of attorney Smith. On March 30, 2001, Brackley was given a copy of the plea minutes so that he could review them with Petitioner and determine whether to make a motion to withdraw Petitioner's plea.

On April 6, 2001, Petitioner and his new counsel appeared before the court. After a discussion at the bench, Brackley made a record that he had been brought into the case for the purpose of discussing with Petitioner his determination to withdraw his plea. To that end, counsel had independently reviewed all of the prior materials in the case, including the motions, hospital reports, discovery materials, and Petitioner's videotaped confession, as well as the minutes of the plea (Appendix, Exhibit N: Sentencing Proceedings at 2-4).

Based on his review of the plea minutes, counsel
had concluded that there was no question regarding the
voluntariness or the knowing nature of Petitioner's plea,
nor was there any point where Petitioner did not consent or
acknowledge that he understood his rights and had agreed to
waive them. Counsel noted that there was no break during
Petitioner's allocution or anything similar that would seem
to indicate that Petitioner did not know what he was doing
(id. at 3).

The judge denied Petitioner's motion based on the
court's review of Petitioner's plea allocution and
considering the opinion of defense counsel – "an
experienced attorney" – that there was "no basis" for
withdrawing the plea (id. at 5-7).

On the same day that his plea withdrawal motion
was denied, Petitioner was arraigned for sentence
(Appendix, Exhibit N: Sentencing Proceedings at 7-15).

The court then imposed the "agreed upon" sentence
of 25 years to life imprisonment (id. at 15). The
prosecutor and counsel noted that Petitioner had waived his
right to appeal. Petitioner asked the court if he had "no

16

right to appeal," the judge told Petitioner to "discuss that with somebody" and asked defense counsel whether he would file a notice of appeal on Petitioner's behalf. Counsel agreed to do so (id. at 15-16).

## The Constitutional Standard

Since Petitioner's petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 100 Stat. 1214, his petition is governed by the provisions of that act. Slack v. McDaniel, 529 U.S. 473, 480-81 (2000). Under AEDPA, all federal claims that were "adjudicated on the merits" by the state courts must be reviewed under the standard of review codified in 28 U.S.C. § 2254(d). Price v. Vincent, 538 U.S. 634, 638 (2003). As the Second Circuit has explained, a state court adjudicates a claim on its merits when it "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). For those claims that have been adjudicated on the merits, AEDPA "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Bell

v. Cone, 543 U.S. 447, 455 (2005) (internal quotes and citations omitted).

Pursuant to AEDPA, a Petitioner must show that the state court's adjudication of his constitutional claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Under either prong of 28 U.S.C. § 2254(d), the factual findings of the state courts are presumptively correct, and that presumption may be overcome only upon a showing of "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1); see also Overton v. Newton, 295 F.3d 270, 275 (2d Cir. 2002). To secure relief under the "contrary to" clause of § 2254(d)(1), a Petitioner must show either that the state court evaluated his claim under a rule that "contradicts" the governing law as set forth by the Supreme Court, or that the state court reached a different result on facts "materially indistinguishable from a decision of" the Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000).

Under the "unreasonable application" clause of §
2254(d)(1), relief is available if the state court has
"correctly identifie[d] the governing legal rule but [has]
applie[d] it unreasonably to the facts of a particular
prisoner's case." Williams, 529 U.S. at 407. In making
this inquiry, the Court must determine whether the
Petitioner has "show[n] that the state court applied [the
relevant Supreme Court precedent] to the facts of his case
in an objectively unreasonable manner," Woodford v.
Visciotti, 537 U.S. 19, 25 (2002), keeping in mind that a
habeas court cannot grant relief simply because it believes
that the state court has erred. See Bell, 535 U.S. at 698-
99 (2002); Williams, 529 U.S. at 410-11. Rather, "[s]ome
increment of incorrectness beyond error is required" before
a state court adjudication may be termed unreasonable.
Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).
And, as the Supreme Court has recently emphasized, AEDPA
imposes "a substantially higher threshold" to obtaining
habeas relief than applied prior to that enactment.
Schriro v. Landrigan, 127 S. Ct. 1933, 1939 (2007). Thus,
if the state court's decision cannot be viewed as
objectively unreasonable, habeas relief is foreclosed
regardless of how this Court would resolve the issue in the

19

first instance. See Brown v. Payton, 544 U.S. 133, 147 (2005); Yarborough v. Alvarado, 541 U.S. 652, 665-66 (2004); Sellan, 261 F.3d at 310.

To prevail on a claim that he was denied the effective assistance of counsel, either at the trial level or upon an appeal provided as of right, Petitioner must satisfy the familiar two-part standard enunciated in Strickland v. Washington, 466 U.S. 668 (1984). See Smith v. Robbins, 528 U.S. 259, 288-89 (2000); McKee v. United States, 167 F.3d 103, 106 (2d Cir. 1999). First, Petitioner must establish that counsel's performance "fell below an objective standard of reasonableness" because, in light of all the circumstances, the acts or omissions complained of "were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 688, 690. In reaching this determination, there is a strong presumption that an attorney acted competently, and a reviewing court must be "highly deferential" in scrutinizing the attorney's exercise of professional judgment. Id. at 688. To obtain habeas relief, it does not suffice "for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). Thus, actions

or omissions by counsel that might be considered sound strategy do not constitute ineffective assistance. See Strickland, 466 U.S. at 689; McKee, 167 F.3d at 106; Lopez v. Scully, 58 F.3d 38, 42 (2d Cir. 1995); Mason v. Scully, 16 F.3d 38, 42 (2d Cir. 1994). A reviewing court should be "reluctan[t] to second-guess" a particular strategy simply because it was not successful. Trapnell v. United States, 725 F.2d 149, 155 (2d Cir. 1983); see also Lockhart v. Fretwell, 506 U.S. 364 (1993).

Even if Petitioner can show that counsel's performance fell below that standard, he is not entitled to relief unless he can also establish that his attorney's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. To satisfy this part of the test, Petitioner must be able to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694; see also Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); United States v. Boothe, 994 F.2d 63, 68-69 (2d Cir. 1993).

21

**The Conduct of Counsel on the Motion
To Withdraw His Plea Was Not Constitutionally Defective**

Petitioner claims, as he did on direct appeal,
that the attorney assigned to investigate his claims, i.e.
Brackley, did not merely decline to pursue Petitioner's
motion, but also actively advocated against it (Amended
Petitioner, Point I at 13-20). In fact, the state court
record demonstrates that Petitioner's attorney did all that
was required of an effective advocate; he simply recognized
the obvious -- that there was no basis whatsoever to move
to withdraw Petitioner's guilty plea -- and acted
accordingly. The record also shows that any arguable
deficiencies in counsel's performance had, from the defense
perspective, no negative effect on the outcome of the case.

Brackley conducted a thorough investigation into
Petitioner's case, interviewed the attorney who had
represented Petitioner in the initial phases of the
criminal proceedings, including the plea negotiation,
reviewed the case file, including the compelling evidence
establishing Petitioner's guilt of the charged crimes and
discussed the case and withdrawal motion with Petitioner,
and carefully reviewed the transcript of Petitioner's plea

allocution. Brackley determined that nothing in the record indicated that Petitioner's plea was unknowing or involuntary, or otherwise supported Petitioner's pro se motion to withdraw the plea. He advised Petitioner that he would be best served by not withdrawing his guilty plea, as Petitioner could receive a far greater sentence after trial than the court had offered in consideration of his guilty plea. Nevertheless, despite his professional assessment that Petitioner's claims lacked merit, counsel urged the court to allow Petitioner to explain his reasons for wishing to withdraw his plea and then independently rule on the motion (Appendix, Exhibit N: Sentencing Proceedings at 2-5).

Under these circumstances, where counsel conducted a reasonable investigation into the merits of Petitioner's claims, his strategic decision to refrain from filing a plea withdrawal motion on Petitioner's behalf is unassailable. See Strickland, 466 U.S. at 690; Pavel v. Hollins, 261 F.3d 210, 218-19 (2d Cir. 2001); Lopez v. Scully, 58 F.3d at 42; cf. Wiggins, 539 U.S. at 522-27 (finding ineffective assistance only when counsel's tactical decision was based upon an unreasonable investigation).

Even if counsel's conduct in not filing a plea withdrawal motion fell below the standard of constitutional competence, Petitioner would still be entitled to no relief, as he cannot establish that he was prejudiced by this choice, since the motion was meritless. See Strickland, 466 U.S. at 694. First, there can be no question that Petitioner's plea was knowing and voluntary, and thus there was no basis to grant his plea withdrawal application on those grounds.[3] Petitioner specifically told the court that he had had enough time to discuss his plea with his attorney, that no one, including his attorney, had forced him to plead guilty, and that he understood both the charges against him and the rights which he was waiving, including any potential defenses to the crime (Appendix, Exhibit L: Plea Proceedings at 194-198, 201). See Pendleton v. Scully, 664 F. Supp. 100, 101 (S.D.N.Y. 1987).

---

[3] "[A]lthough 'the governing standard as to whether a plea of guilty is voluntary for purposes of the Federal Constitution is a question of federal law,' questions of historical fact, including inferences properly drawn from such facts, are in this context entitled to the presumption of correctness accorded state court factual findings." Parke v. Raley, 506 U.S. 20, 35 (1992) (quoting Marshall v. Lonberger, 459 U.S. 422, 431 (1983) (internal citation omitted)).

24

Moreover, at the beginning of Petitioner's thorough allocution and before accepting Petitioner's plea, the court confirmed that Petitioner understood that if he chose to plead guilty, he would be admitting that he had intentionally caused the death of Corniel by shooting him (id. at 194). Then, during Petitioner's factual allocution, the court secured Petitioner's admission that when he shot Corniel he had intended to cause his death (id. at 200). Petitioner's acknowledgment that his crime was intentional, and that he understood the rights that he was waiving by pleading guilty, stands as compelling evidence of the knowing and intelligent nature of his plea. Petitioner was quite well informed of the consequences of pleading guilty, and he still chose to do so. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) (holding that a defendant's sworn statements made in open court during a plea proceeding carry a "strong presumption" of veracity, and thus present a "formidable barrier" that cannot be easily overcome in later proceedings); Padilla v. Keane, 331 F. Supp. 2d 209, 217 (S.D.N.Y. 2004) ("where a defendant . . . has explicitly stated in his allocution that he fully understands the consequences of his plea and that he has chosen to plead guilty after a thorough consultation with his attorney, a district court on habeas

review may rely on the defendant's sworn statements and hold him to them").

Even taken at face value, Petitioner's claim that he had been "scared" amounted to little more than a reevaluation of the People's case against him and provided no basis for the court to find that his plea had been involuntary. See United States v. Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992). Petitioner's plea came immediately after the suppression hearing which allowed a preview of the extensive evidence against him: numerous eyewitness identifications, the evidence that had led to his arrest, and his own damning confession captured on videotape. In light of Petitioner's repeated acknowledgment that he understood the consequences of his plea, and that no promises other than the sentencing promise of 25 years to life were made to him, his belated protests rang particularly hollow. All those facts underscored that Petitioner's decision to plead guilty was a knowing, voluntary, and rational one.

Even when asking to withdraw his plea, Petitioner merely said that his attorney advised him that the only way the court would "take" the plea was if Petitioner admitted

that he had committed the crime intentionally (Appendix, Exhibit M: Motion Proceedings at 4). Such advice, if given, cannot be considered "coercion" since it was nothing more than the truthful explanation of the conditions under which the court would accept the plea, information which, of course, counsel was obligated to provide to Petitioner. See Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996), cert. denied, 521 U.S. 1118 (1997). Notably, the trial court asked Petitioner if he was prepared to admit that the crime was intentional before his plea, and Petitioner advised her that he was (Appendix, Exhibit L: Plea Proceedings at 194). See Bradshaw v. Stumpf, 545 U.S. 175, 182-84 (2005). Based on Petitioner's allocution and the specific "complaints" he later made about his attorney, the court recognized counsel had not applied undue pressure to induce Petitioner's guilty plea, but had simply provided his truthful, if unwelcome, advice regarding the strength of the People's case, the advisability of accepting the plea bargain, and the admissions required by the court for Petitioner's allocution. See United States v. Juncal, 245 F.3d 166, 174 (2d Cir. 2001) ("It is similarly common place that a defendant will feel "coerced" in the lay sense of the word by an attorney's recommendation to plead guilty rather than proceed to trial"). On this record, the

Appellate Division's conclusion that Petitioner's motion "was both facially meritless and negated by [Petitioner's] plea allocution," was not only reasonable, it was decidedly correct. Lightfoot, 306 A.D.2d at 107.

Petitioner, though, suggests that Brackley had a conflict of interest requiring his removal prior to the court's determination of the pro se withdrawal motion. Here, however, Petitioner received the precise relief that this Court found should have been granted in Guzman v. Sabourin, 124 F. Supp. 2d 828 (S.D.N.Y. 2000): where a conflict of interest could have arisen based on Petitioner's complaints about the conduct of his attorney at his guilty plea, the original attorney declined to "comment on the merits of his client's claims," and the court granted his request that new counsel be assigned to represent Petitioner on his motion to withdraw the guilty plea. Id. at 834, 836; see also United States v. Davis, 239 F.3d 283, 287 (2d Cir. 2001) (finding that defense counsel had an actual conflict of interest because the defendant's accusation that he was coerced into pleading guilty "placed his attorney in the position of having to defend himself, and potentially to contradict [defendant], in open court"). Brackley, the new counsel who was then

28

assigned, had played absolutely no role in Petitioner's guilty plea, and was thus free from the conflict of interest which might have existed between Petitioner and his initial attorney, the same type of potential conflict which served the basis for the Guzman ruling.

Brackley, unlike the defense attorney in Guzman, did not labor under allegations that any of his actions or statements had induced a guilty plea. No "conflict" was created merely because Petitioner disagreed with his attorney's conclusions.

Counsel did not reveal confidential communications when Brackley told the court that Petitioner had first said that he did not intend to commit the crime, and then that he believed that his plea had been coerced (see Amended Petition at 17). As the Appellate Division recognized, see Lightfoot, 306 A.D.2d at 107, counsel was merely setting forth the reasons Petitioner had given for wanting his plea back, before advising the court that although either of those assertions, if true, might have supported a plea withdrawal motion, Petitioner had not provided sufficient indicia of their veracity such that counsel could prepare an affidavit to that effect

(Appendix, Exhibit N:   Sentencing Proceedings at 4-5).
Since Brackley had been assigned to investigate whether
there was a viable claim for a plea withdrawal, he had a
duty to advise the court what information he had been given
and whether that information was sufficiently trustworthy
to rely on in submitting an application on Petitioner's
behalf.   See Nix v. Whiteside, 475 U.S. 157, 168-69, 173
(1986) (holding that an attorney's duty to zealously
represent a client is circumscribed by an "equally solemn
duty to comply with the law and standards of professional
conduct . . . to prevent and disclose frauds upon the
court").   Since Petitioner had made precisely the same
allegations in open court at the prior proceeding
(Appendix, Exhibit M:   Motion Proceedings at 3-4, 6-8), and
Brackley had reviewed those minutes, counsel was certainly
well aware that he was "not betray[ing] his client's
confidences" in relaying that information.   Lightfoot, 306
A.D.2d at 107.

     In any event, even if Petitioner's claims that
Brackley somehow overstepped his role as advocate by
outlining the facts which supported his determination that
Petitioner's motion was meritless, Petitioner cannot show
that he was prejudiced by counsel's statements.   In a final

distinction between this case and Guzman, this Court determined that the trial judge's ruling on Guzman's motion to withdraw his guilty plea had been "influenced" by his attorney's statements to the court. Guzman, 124 F. Supp. at 835. Here, conversely, the record establishes that the trial court denied Petitioner's motion for a plea withdrawal based on its own judgment, rather than in reliance on counsel's statements explaining why he had elected not to join that motion.

The court here found in two separate instances that there was no basis for Petitioner to withdraw his plea. Specifically, when Petitioner was represented by his original attorney, the court initially denied Petitioner's motion on the grounds that during his plea allocution, Petitioner had been given every opportunity to consider his options, that he had received a highly favorable plea bargain, and that he had known "exactly what his situation was" when he "chose to plea guilty" (Appendix, Exhibit M: Motion Proceedings at 3).

Subsequently, when Petitioner was represented by Brackley, the judge reviewed all of the incriminating evidence Petitioner knew of before he entered his plea, and

noted her assessment that Petitioner had pleaded guilty
because he had received an extremely favorable plea bargain
in light of the strength of the People's case and his
criminal history. The court also pointed out that when
Petitioner advised the court of his willingness to accept
the plea offer, the People were ready to proceed to trial
and had witnesses available both from Virginia and New York
prepared to testify. Most significantly, as noted,
Petitioner's allocution established that his plea was
voluntary (Appendix, Exhibit M: Motion Proceedings at 6-
7). Therefore, while the court undoubtedly listened to
Brackley's statements, the trial judge at both proceedings
made an independent determination that no grounds existed
that would entitle Petitioner to withdraw his guilty plea.
See Lightfoot, 306 A.D.2d at 107. Under these
circumstances, Petitioner cannot demonstrate that he was
prejudiced by his counsel's decision to refrain from filing
a frivolous plea withdrawal motion. See Lopez, 58 F.3d at
42; Mayo, 13 F.3d at 533.

Notably too, counsel's decision to refrain from
filing a plea withdrawal motion did not hinder his client's
application for relief. In fact, despite counsel's
assessment that he could not supply a valid reason for the

court to permit Petitioner to withdraw the plea, Brackley still urged the trial court to entertain Petitioner's application, and the court obliged counsel's request (Appendix, Exhibit N: Sentencing Proceedings at 5). Petitioner was then able to argue to the court, as he did before, that his plea should be set aside because he did not commit the crimes intentionally (id.). Of course, as noted above, Petitioner's thorough plea allocution, in which he admitted to intentionally shooting the victim to death, provided a sound basis for the court's ultimate decision to reject Petitioner's motion.

Petitioner also claims that he was denied effective assistance by both attorneys assigned to represent him before the trial court: Smith, who represented Petitioner from the beginning of the case through Petitioner's guilty plea and initial plea withdrawal motion; and Brackley, who replaced Smith upon Petitioner's allegations in his withdrawal motion that prior counsel had, in essence, coerced him into pleading guilty (Amended Petitioner, Point III at 31-38). Specifically, Petitioner alleges that both attorneys failed to properly investigate his claims of self-defense and never informed him of a possible justification defense (id.

33

at 32-34, 37). The trial court rejected these claims (Appendix, Exhibit W), which Petitioner raised in post-judgment motion pursuant to New York Criminal Procedure Law § 440.10 (Appendix, Exhibit U).

Where a defendant has pleaded guilty, the Strickland standard requires him to show, first, that his attorney's advice to plead guilty was not "within the range of competence demanded of attorneys in criminal cases," and second, that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 56, 59 (1985); see also Roe v. Flores-Ortega, 528 U.S. 470, 485 (2000). Further, to show prejudice, the defendant must demonstrate that he had a viable trial defense. See Hill, 474 U.S. at 59-60. Thus, the inquiry turns "largely" on whether a defense "would have succeeded at trial," that is, whether the defendant "would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received." Id. at 59 (citation and internal quotation marks omitted). Such "predictions" about "the outcome at a possible trial . . . should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.'" Id. at 59-60 (quoting

Strickland, 466 U.S. at 695). Finally, as noted above, an
attorney's representation is presumed effective and any
state court factual findings relevant to an ineffective
assistance claim must be presumed correct on federal habeas
corpus review. See 28 U.S.C. § 2254(e)(1).

Here, Petitioner received effective assistance
from Smith. Counsel began his representation of Petitioner
by traveling to meet with him in Virginia where he was
being held on an unrelated matter prior to extradition and
arraignment in New York (see Appendix, Exhibit V: 440.10
Response at 5-6; Appendix, Exhibit W: 440.10 Decision at
3). Smith then represented Petitioner for nine months,
discussing the case with him, making motions on his behalf,
preparing the case for trial, and representing Petitioner
at the suppression hearing (id.). Counsel quickly gained
access to the People's evidence, including Petitioner's
statements to law enforcement. So too, from the beginning,
counsel made every attempt to limit the severity of
Petitioner's sentence, first by obtaining a mitigation
report to submit to the District Attorney's panel
determining whether to seek the death penalty (see
Appendix, Exhibit V: 440.10 Response at 5-6), and by
negotiating for a plea bargain (see Appendix, Exhibit N:

Sentencing Proceedings at 6-7). Indeed, even upon Petitioner's motion to withdraw his plea, counsel steadfastly refused to defend himself from Petitioner's claims of coercion and thereby put himself in conflict with Petitioner by disclosing his confidential communications with his client. Rather, counsel repeatedly requested and was ultimately successful in convincing the court to appoint Petitioner new counsel to independently review the bases for Petitioner's plea withdrawal motion (Appendix, Exhibit M: Motion Proceedings at 3-5, 7-9). Similarly, as discussed above, Petitioner received the effective assistance of Brackley, who was assigned to review Petitioner's pro se motion to withdraw his guilty plea.

Despite having received the diligent assistance of two experienced and well-qualified attorneys, Petitioner maintains that each of them failed to investigate his claims of self-defense and to advise him about the potential risks and benefits of proceeding to trial with such a justification defense. However, this contention is directly contrary to the factual findings of the trial court. Indeed, in ruling on Petitioner's C.P.L. § 440.10 motion, the trial judge specifically found that prior to Petitioner's plea, "Smith had knowledge of [Petitioner's]

claimed defense, had discussed it with him and, as a knowledgeable and experienced attorney, also discussed with [Petitioner] the likelihood of its success given the strength of the People's case" (Appendix, Exhibit W: 440.10 Decision at 3).

This factual finding is presumptively correct, see 28 U.S.C. § 2254(e)(1), and Petitioner has offered no evidence to show that this finding was erroneous. Petitioner's statements to law enforcement, which were promptly disclosed to counsel, were replete with Petitioner's claims of concern that he was about to be harmed by the men he ended up shooting multiple times. Indeed, in Petitioner's letters to his attorneys he admitted that he had discussed his claims of self-defense with his counsel (Appendix, Exhibit U: 440.10 Motion, Motion Exhibit F). As Justice Sudolnik concluded, it is "inconceivable" that counsel failed to discuss Petitioner's claims of self-defense (Appendix, Exhibit W; 440.10 Decision at 3). This factual finding is dispositive of Petitioner's present claim for habeas relief.

In his letter to his attorneys, Petitioner specifically referred to "consultations" with counsel in

37

which they advised him that "the circumstances and evidence" in Petitioner's case did not "substantiate[] a justification defense" (Appendix, Exhibit U: 440.10 Motion, Motion Exhibit F). Petitioner's claim that "neither counsel had ever informed [him] of a justification defense" (Amended Petitioner at 33) is thus contradicted. Both attorneys advised Petitioner that, given the evidence against him and the vagaries of his own prior statements, he was decidedly unlikely to prevail in a justification defense at trial. Despite counsel's advice to the contrary, however, Petitioner contends that his "justification defense was viable" (Amended Petitioner at 34), and he cites to cases in support of that argument (see Amended Petition at 22, 25-27). Those cases, however, address only the issue of under what circumstances a defendant is entitled to have the jury charged on the defense of justification. In determining whether to issue a jury charge on justification, the trial court is obligated to examine whether "any reasonable view of the evidence" when "considered most favorably to [the] defendant" could support the defense. People v. Padgett, 60 N.Y.2d 142, 144-145 (1983). That, of course, is a different standard than that which must be satisfied by Petitioner in the instant habeas claim. Petitioner is not

obligated to show merely that he would have been entitled to have the jury charged on the law of justification, he must show that the defense "would have succeeded at trial." Hill, 474 U.S. at 59.

Even crediting Petitioner's self-serving statements, the Petitioner had no arguable justification defense to the murder of Corniel, the only charge to which he pleaded guilty. While Petitioner's protestations that he believed that his first victim was about to harm him because he was reaching toward his waistband might have secured a justification charge as to that victim, that was the extent of any possible justification defenses. Although at one point, Petitioner vaguely claimed that his third victim also posed some sort of danger to him (Appendix, Exhibit I: People's Hearing Exhibit 3C: Petitioner's Handwritten Statement Extension), in his videotaped statement, Petitioner admitted that "to be honest" he had no idea what that man was doing when Petitioner shot him (People's Hearing Exhibit 5: Videotaped Statement), an admission that precluded a justification defense.

Corniel, was not, even by Petitioner's accounts,
posing any threat to anyone at the time Petitioner opened
fire on him. Indeed, Petitioner himself claimed that when
he saw Corniel just before firing, White was holding the
victim in a chokehold (Appendix, Exhibit I: People's
Hearing exhibits 3B, 3C: Petitioner's Handwritten
Statements #1-2; People's Hearing Exhibit 5: Videotaped
Statement). As Corniel, being so restrained, could not
possibly have been about to "use deadly physical force" or
in the midst of committing a robbery, the jury simply could
not have found Petitioner's own use of deadly force upon
him to have been justified. See New York Penal Law §
35.15(2)(a), (b); People v. Cox, 92 N.Y.2d 1002, 1005
(1998). Although Petitioner might have succeeded in having
the jury charged on justification with respect to one of
his victims, he would not have obtained such a charge as to
either Corniel or the other victim.

Petitioner also contends that had his attorneys
properly investigated his claims, they would have
discovered that co-defendant White's statements to police
inculpating Petitioner were false. That allegation appears
to be based on what Petitioner considers a "material
contradiction" in White's statements: whether he and

Petitioner had all of the money for the drugs they would supposedly purchase from Corniel (Amended Petitioner at 32). To be sure, had Petitioner proceeded to trial, such a contradiction might have been utilized by counsel in cross-examination of White in order to raise questions about his credibility. But Petitioner's expectation that a jury would find that contradiction so "material" to White's credibility regarding whether he and Petitioner had intended to rob Corniel or simply buy drugs from his is unfounded, especially in light of the evidence that this robbery had been planned in advance.

Even if defense counsel could have secured permission from White's attorney to speak with him, Petitioner offers no reason to believe that White would have offered a different version of events than he provided to law enforcement and ultimately admitted in his guilty plea. Indeed, upon submitting his § 440.10 motion, Petitioner could not induce White to submit an affidavit reneging on his earlier claims. That is unsurprising since White pleaded guilty to first-degree robbery, thus substantiating his earlier statements that he and Petitioner had purposefully robbed Corniel.

41

There is also no support to Petitioner's claim that, but for his attorneys' representation, there was a reasonable probability that Petitioner would have proceeded to trial. See Hill, 474 U.S. at 59; Panuccio v. Kelly, 927 F.2d 106, 109 (2d Cir. 1991). Counsel had obtained a highly favorable sentence bargain for Petitioner, and that was Petitioner's main concern from the time he was first approached by police in connection with this murder case. When Petitioner was first contacted by Detective Deleon in Culpeper, Virginia on February 9, 2000, and was informed that he was a suspect in this case, he asked, in reference to his potential sentence, "Is it possible I could get less than 15?" (Deleon: 46-30). And, when the prosecutor interviewed him several weeks later, Petitioner inquired whether he could "get a good deal" (Gardella: 177-179). When he was returned to New York City for arraignment, he informed a detective that he was interested in making a deal and "could do 10 years" in prison (Berkley: 182-192). Before Petitioner ultimately accepted a plea bargain -- during which time he apparently accepted the reality that he was facing a far harsher sentence than he had hoped to receive -- he had little, if any, intention of proceeding to trial, but hoped to negotiate for the lowest possible sentence he could secure.

A defendant's later regret about the length of his negotiated sentence does not entitle him to then withdraw his guilty plea. See Gonzalez, 970 F.2d at 1100. Counsel's honest assessment that Petitioner likely would not prevail on a justification defense, along with Petitioner's concomitant decision to accept a sentence that was more severe than what he had hoped for, does not indicate that Petitioner would have proceeded to trial or prevailed in a justification defense, but for counsel's advice.

Petitioner has not sustained his burden of showing ineffective assistance of counsel regarding the potential justification defense. Because each counsel's and law, and Petitioner cannot show that he would have proceeded to trial or prevailed there, his habeas claims on this ground must be denied.

**The Conduct of Appellate Counsel
Was Not Constitutionally Defective**

Petitioner also claims that he was denied the effective assistance of appellate counsel by Claudia S.

Trupp, Esq. ("Trupp"), of the Center for Appellate
Litigation. Petitioner contends that Trupp ought to have
argued that Petitioner's guilty plea had not been
voluntary, knowing, and intelligent "based on the court's
failure to inquire about [Petitioner's] justification
defense" (Amended Petition, Point II at 21-30). Petitioner
faults his appellate attorney for instead raising issues
which he claims the Appellate Division found "facially
meritless" (id. at 29). Despite Petitioner's
characterization of the Appellate Division's decision, it
was not appellate counsel's arguments but Petitioner's own
motion to withdraw his guilty plea which the Appellate
Division found to be "both facially meritless and negated
by [Petitioner's] plea allocution." Lightfoot, 306 A.D.2d
at 107.

Here, the issue is not whether Petitioner might
have had a "meritorious claim of justification" (Amended
Petitioner at 22), but rather whether appellate counsel
properly declined to argue that the court's inquiry prior
to Petitioner's guilty plea was insufficient to establish
that Petitioner's plea was voluntary, knowing, and
intelligent. On that score, Petitioner contends that
counsel pursued "issues that were clearly and significantly

44

weaker" than the new "significant and obvious issue"
Petitioner had identified, namely, that based upon
Petitioner's "statements in open court, the circumstances
of [his] case, and the applicable case law," the court was
obligated to "make a further inquiry" as to whether
Petitioner voluntarily, knowingly, and intelligently waived
the specific defense of justification (id. at 27, 29).

Appellate counsel's failure to raise any
particular claim does not, by itself, demonstrate
ineffectiveness. The Supreme Court has clearly stated that
appointed counsel is not required to "press [even]
nonfrivolous points" if, as a matter of "professional
judgment," counsel opts against such a strategy. Jones v.
Barnes, 463 U.S. 745, 751 (1983). Counsel is entrusted
with discretion to decide which points to argue, because
effective appellate advocacy involved focusing on a few key
issues and "winnowing out weaker arguments" that may
detract from those claims. See id. at 751-52. That is so
because trained counsel possess a "superior ability" to
examine the record, research the law, and marshal the
arguments on a defendant's behalf. Id. at 751 (citing
Douglas v. California, 372 U.S. 353, 358 (1963)). In fact,
the best appellate briefs focus on "one central issue if

possible, or at most on a few key issues." Id. at 751-52.
"'[M]ultiplying assignments of error will dilute and weaken
a good case and will not save a bad one.'" Id. at 752
(quoting Jackson, Advocacy Before the United States Supreme
Court, 25 Temple L.Q. 115, 119 (1951)).

Courts should accordingly respect an appellate
counsel's strategic decision to focus an appeal on a select
issue or issues, instead of raising every potentially
"colorable" claim. Id. at 753-54; see also Evitts v.
Lucey, 469 U.S. 387, 394 (1985). Just as a trial counsel's
strategic choices deserve deference, an appellate counsel's
strategy in the selection of issues should not be second-
guessed based on "hindsight." McKee, 167 F.3d at 106.
Therefore, the Strickland standard sets a high bar for
proving ineffectiveness of appellate counsel, because an
appellate attorney "need not (and should not) raise every
frivolous claim, but rather may select from among them in
order to maximize the likelihood of success on appeal."
Smith, 528 U.S. at 288; see Aparicio v. Artuz, 269 F.3d 78,
97 (2d Cir. 2001); Gray v. Greer, 800 F.2d 644, 646 (7th
Cir. 1985) ("Generally, only when ignored issues are
clearly stronger than those presented, will the presumption
of effective assistance of counsel be overcome").

Applying these standards here, the state court's conclusion that Petitioner received effective assistance of appellate counsel was not contrary to, or an unreasonable application of, Supreme Court precedent. At the outset, Petitioner was well-represented on appeal. Appellate counsel filed at 21-page brief raising two legal issues related to Petitioner's guilty plea (Appendix, Exhibit O). Counsel argued that Petitioner's waiver of his right to appeal the length of his sentence was invalid and that his sentence should be reduced to the minimum possible term (id. at 16-21). Counsel also argued that Petitioner received the ineffective assistance of counsel upon his withdrawal motion, a claim which Petitioner found sufficiently persuasive to repeat as his first point in the instant habeas corpus petition (id. at 11-16; see Amended Petition, Point I at 13-20). While acknowledging that the attorney assigned to review Petitioner's motion to withdraw his plea was not obligated to support a motion he believed to have no merit, appellate counsel argued that Petitioner's attorney had been so disparaging of the pro se withdrawal motion as to render his representation ineffective (id. at 11).

By declining to argue that Petitioner's
withdrawal motion was improperly denied in favor of arguing
that counsel's treatment of it had been ineffective,
appellate counsel sought to divert the Appellate Division
from making a direct ruling on the merits of Petitioner's
withdrawal motion. The Appellate Division nevertheless
ruled that Petitioner's motion was "both facially meritless
and negated by [Petitioner'] plea allocution." Lightfoot,
306 A.D.2d at 107; counsel could not have prevailed on any
argument challenging Petitioner's plea allocution.
Counsel's strategy of arguing ineffective assistance of
counsel did leave open the possibility that the Appellate
Division could remand the matter for a de novo hearing on
the motion with yet another attorney. In essence, counsel
was attempting to give Petitioner a third bite at the
withdrawal apple. Hence, appellate counsel made the most
cogent arguments supported by the record and provided
Petitioner with a proper appeal.

Petitioner, nevertheless, claims that appellate
counsel should have argued that his admission that he
understood that "by pleading guilty he was giving up any
defense he had" was "insufficient," and that the trial
court was required to make a more specific inquiry

48

regarding a potential justification defense (Amended Petition at 27). Of course, in order to accept a guilty plea, a trial court is not required to explore with the defendant "each potential defense relinquished by a plea of guilty." United States v. Broce, 488 U.S. 563, 573 (1989). While it is true that in certain circumstances, New York law requires a court to "inquire further to ensure that [a] defendant's guilty plea is knowing and voluntary," that duty arises only "where the defendant's recitation of the facts underlying the crime pleaded to clearly casts significant doubt upon the defendant's guilt or otherwise calls into question the voluntariness of the plea." Anaya v. Brown, 05 Civ. 8974 (DLC), 2006 U.S. Dist. LEXIS 62186, at *21, (S.D.N.Y. Sep. 1, 2006) (quoting People v. Lopez, 71 N.Y.2d 662, 666 (1988)). "'The trial court's duty to inquire is triggered where the defendant's recitation of the facts underlying the crime casts significant doubt upon his guilt or on the voluntariness of his plea' for example by raising the possibility of an affirmative defense." Id. (quoting People v. Pariante, 283 A.D.2d 345 (N.Y. App. Div. 2001). Here, nothing in Petitioner's plea allocution cast doubt on his guilt or on the voluntariness of his plea, and thus there was no requirement for the court to conduct a further inquiry into the specific defense of justification

after ascertaining that Petitioner had discussed any potential defenses with counsel and understood that by pleading guilty he was giving up his right to assert any such defenses at trial.

At his plea hearing, Petitioner stated his understanding of the terms of the plea bargain that he was accepting, the nature of the crime to which he was pleading guilty, and the trial rights he was forfeiting by his guilty plea. More specifically, Petitioner also stated that he had "discussed" with his attorney "any defenses [he] may have [had] in this case," and understood that by pleading guilty he was relinquishing "the right to claim any kind of defense" (Appendix, Exhibit L: Plea Proceedings at 194, 201). At no time did Petitioner indicate that, rather than plead guilty, he wished to pursue a claim of self-defense at trial. Petitioner's statements at his plea allocution carried "a strong presumption of verity." Blackledge, 431 U.S. at 74 (1977). As Petitioner's allocution raised not even a hint that he continued to adhere to his prior claims of self-defense, the trial court was not obligated to specifically inquire about the possibility that Petitioner might have wished to assert the justification defense at trial.

50

The fact that Petitioner previously had made self-serving claims in his statements to police and the prosecutor to the effect that he had shot his victims because he believed they might be planning to harm him (see Amended Petition at 21-22, 24, 27) triggered no duty of further inquiry by the trial court. "Whether such a duty has arisen is determined by examining a defendant's statements at the plea allocution" alone. Anaya, 2006 U.S. Dist. LEXIS 62186, at *22 (citing People v. Harris, 251 A.D.2d 79 (N.Y. App. Div. 1998). Here, the court's inquiry into the fact that Petitioner had discussed any potential trial defenses with his counsel, and that Petitioner understood that "any kind of defense" would be waived by his guilty plea, was sufficient. Because Petitioner said nothing during the plea colloquy that even hinted that he had acted in self-defense, the court was under no obligation to discuss that potential defense with Petitioner. Petitioner cannot show that, had counsel made such an argument, the outcome of his appeal would likely have been different.

Petitioner has thus failed to sustain his burden of showing that both counsel's representation was deficient, and that any such deficiency caused the state

court to deny his appeal. Habeas relief on this ground
must therefore be denied.

## Conclusion

For the foregoing reasons, the petition for a
writ of habeas corpus is dismissed and the requested relief
denied pursuant to Rule 8 of the Rules Governing 28 U.S.C.
Section 2254 cases.

As Petitioner has not made a substantial showing
of the denial of a constitutional right, a certificate of
appealability will not issue. 28 U.S.C. § 2253; see also
United States v. Perez, 129 F.3d 255 (2d Cir. 1997); Lozada
v. United States, 107 F.3d 1011 (2d Cir. 1997). Pursuant
to 28 U.S.C. § 1915(a)(3), it is hereby certified that any
appeal from this order would not be taken in good faith.
Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

It is so ordered.

New York, N.Y.
February 20 , 2008

ROBERT W. SWEET
U.S.D.J.